Jay R. Monroe, Inc. v. Commissioner.
Jay R. Monroe, Inc. v. Commissioner
Docket Nos. 109898, 111415.
United States Tax Court
1943 Tax Ct. Memo LEXIS 128; 2 T.C.M. (CCH) 744; T.C.M. (RIA) 42507; September 7, 1943
*128 On the facts, held that under section 505 (b) of the Internal Revenue Code, petitioner, a personal holding company, is not entitled to claimed deductions for expenses and depreciation on certain real property owned by it. H. Catherine Wagner Vaughan, Esq., for the petitioner. Paul P. Lipton, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion The respondent determined a deficiency in personal holding company surtax against the petitioner for the calendar years 1939 and 1940 in the respective sums of $2,183.22 and $1,165.79. The sole issue is whether the respondent erred in disallowing deductions for expenses and depreciation in respect of certain real estate owned by the petitioner during the taxable years in question. The proceedings have been consolidated and submitted upon the pleadings, stipulation of facts, and documentary evidence. Stipulated facts not set forth are included herein by reference. Findings of Fact The petitioner, a personal holding company, during the taxable years, within the meaning of chapter 2, subchapter A of the Internal Revenue Code, was organized under the laws of New Jersey on June 2, 1923 and has its principal office in *129 Orange, New Jersey. It filed its income and personal holding company tax returns for the years in question with the collector of internal revenue for the fifth district of New Jersey. It was dissolved on February 9, 1942 pursuant to the laws of New Jersey which provide for the continuance of a corporate entity for the purpose of prosecuting and defending suits and of enabling it to settle and close its affairs. It is still in the process of dissolution. The petitioner was organized by Jay R. Monroe and all of its 750 shares of outstanding capital stock, except two qualifying shares, were owned by Monroe until his death on April 29, 1937. Thereafter they were owned by Monroe's Estate, the executors of which became the petitioner's directors and officers. The total capital of the petitioner paid in by Monroe amounted to $418,835.42, consisting of common and preferred shares of Monroe Calculating Machine Company stock having a net equity of $354,985.42 and of donations to capital of $63,850. From 1923 through 1938 thepetitioner bought and sold various securities and some real estate which it was authorized to do under its certificate of incorporation. Dividends from stock of the Monroe *130 Calculating Machine Company constituted the principal source of income of the petitioner. On January 1, 1939, its combined capital and surplus was $1,845,725.58. On July 15, 1926, the petitioner purchased property located in South Orange, New Jersey, at a cost of $80,459.99. At a director's meeting held September 7, 1926 the following resolution was passed with respect to the purchase of this property: RESOLVED, that the purchase of a residence at South Orange, New Jersey, to be occupied by the President of the Company, Mr. Jay R. Monroe, be, and the same hereby is, ratified, confirmed and approved. On October 6, 1927, the petitioner purchased premises adjoining the property purchased in 1926 for $40,429.98. Both properties together consisting of slightly over four acres constitute the premises here involved. Improvements to the property costing $174,174.16 were made during the years 1926 through 1931. The residence on the property is an elaborate structure consisting in addition to servants' quarters, of thirteen rooms including a music room, palm room and sun room. Throughout the house are Tiffany fixtures and leaded casement windows equipped with ultra-violet glass and roll *131 screens. The library, dining room, and music room fireplaces are trimmed with Dutch tile. Installed in the house is a Skinner organ with an echo loft in the attic. The furnishings for the premises were purchased by the petitioner at an aggregate cost of $48,111.82. The premises include two semi-attached garages for eight cars, a storage building, tea house, tennis court with disappearing backstops, green house, and an elevated putting green. The premises were occupied as the personal residence of Monroe and his family until October 1937. Monroe stated that he did not desire to own the residence personally because he had infant children. The premises, including the furniture, were leased by the corporation to Monroe from 1927 through 1932 at an annual rental of $18,000, except for 1927, when the rent was $7,500 due to the fact that the buildings were being altered. On February 27, 1933, the petitioner leased the premises to Monroe's wife until December 31, 1937 at an annual rental of $12,000. Mrs. Monroe's lease was cancelled on June 2, 1937, for the reasons as hereinafter stated and the total amount of rent received from Monroe and his wife was $149,500. Neither Monroe nor his *132 wife received a salary from the petitioner. On its tax returns petitioner reported the rent paid by Monroe and his wife and deducted depreciation, repairs, taxes, and deducted depreciation, repairs, taxes, and interest with respect to the property. The operation of the property by the corporation resulted in losses each year from 1927 through 1940, except 1929 when it had a net operating profit of $36.03. Those losses aggregated approximately $115,903. The profits and losses for the various years were as follows: for 1927 loss $2,901.86; for 1928 loss $313.08; for 1929 profit $36.03; for 1930 loss $10,713.62; for 1931 loss $8,964.58; for 1932 loss $1,472.29; for 1933 loss $5,922.84; for 1934 loss $10,396.34; for 1935 loss $6,617.95; for 1936 loss $9,724.65; for 1937 loss $14,918.46; for 1938 loss $15,265.30; for 1939 loss $15,240.62; and for 1940 loss $13,451.72. During the period of the leases of Monroe and his wife the expenses for maintenance of the property and fixed charges against same (the latter including taxes, mortgage interest, and depreciation) amounted to approximately $212,000, and from 1927 through 1940 such cost and fixed charges amounted to approximately $265,367.63 *133 or an annual average exceeding $18,900. Monroe died on April 29, 1937. His will which was executed on September 14, 1931 and was confirmed and republished by a codicil executed on January 21, 1935 provided in part as follows: FOURTH: I direct my Executors and Trustees hereinafter named, to lease to my beloved wife, RUBY ETHELYN WHEELER MONROE, if she shall survive me, at a nominal rental, during her lifetime, should she desire the same, my residence at Halsey Place. South Orange, New Jersey, and my summer camp at Lake Brantingham, in Lewis County, New York, said properties now being owned by Jay R. Monroe, Inc., a corporation the capital stock of which is wholly owned by me. The Halsey Place mentioned in the above quotation is the property here involved. Mrs. Monroe did not desire to live on the property and on June 2, 1937, the directors of the petitioner cancelled her lease. In accordance with an agreement with the petitioner's directors, Mrs. Monroe occupied the premises until October 1, 1937, as caretaker. The petitioner's directors instructed its officers to offer the place for sale or rent. The officers immediately thereafter, and from time to time, made sustained and vigorous *134 efforts to sell the property through brochures, letters, and advertisements in magazines and newspapers. The property was first offered at approximately $185,000. This was reduced to $125,000 and the property was finally sold for $30,000 on October 18, 1941. Prior to that time only two unsatisfactory offers of purchase had been received. In the fall of 1937 the executors received an offer to rent the premises furnished for $300 a month for a term of three years. The offer was rejected on the grounds that the three-year term would prevent an early sale and that the proposed rent would not cover the cost of maintaining the place. About a year later a similar offer to lease the property was received and rejected. From October 1, 1937, to December 31, 1940 the premises were not occupied by any member of the Monroe family. The executors did, however, maintain a caretaker on the premises to show the property to prospective purchasers and to keep it in good condition. The petitioner claimed deductions in connection with the property on its personal holding company surtax returns as follows: Depreciation
Expenses
1939
$6,301.50
$3,310.49
1940
6,301.59
3,009.80 These deductions *135 were disallowed by the Commissioner in his notice of deficiency and are the ones here in dispute. Opinion TYSON, Judge: In view of the fact that the petitioner received no rent or other compensation from the property whatsoever during the taxable years, it is entitled to deductions for expenses or depreciation under section 505 (b)[1] only if it is established to the satisfaction of the Commissioner, under his regulations: (1) that no rent was obtainable; (2) that the property was held in the course of a business carried on bona fide for profit; and (3) either that there was a reasonable expectation that operation of the property would result in a profit, or that the property was necessary to the conduct of the business. *136 The very fact that this proceeding is before us shows that the petitioner has not satisfied the respondent that it is entitled to the deduction under section 505 (b), supra, and regulations issued thereunder. Thus the respondent's determination must be sustained unless his denial of the deductions was arbitrary and an abuse of discretion. Stranahan v. Commissioner, 42 Fed. (2d) 729, certiorari denied, 283 U.S. 822; Olympia Harbor Lumber Co. v. Commissioner, 79 Fed. (2d) 394; Connery Coal and Investment Co. v. Commissioner, 84 Fed. (2d) 485; First Securities Corporation of Memphis, Tennessee v. Clements, 103 Fed. (2d) 1011; Western Hide & Fur Co., 26 B.T.A. 354; Walter H. Goodrich & Co., Inc., 40 B.T.A. 960. In respect of the first requirement under section 505 (b) (1), supra, namely, that the petitioner establish that no rent was obtainable from the property as to which the deductions are sought, the facts show that in the fall of 1937 the executors received *137 an offer to lease the premises furnished for $300 a month for a term of three years and that a year later a similar offer was received, but that both offers were rejected because a three-year term would have prevented an early sale and because the proposed rent would not cover the cost of maintaining the lease. There is no showing that any effort was made to induce the parties desiring to qualify their offer by agreeing to lease with the privilege to petitioner of cancellation of the leases in case it could sell the property during the terms of the proposed leases. The record shows that the petitioner made sustained and vigorous efforts to sell the property, but there is no evidence to indicate that any attempt was made to rent it for the taxable years or for any year subsequent to the cancellation of Mrs. Monroe's lease in June 1937. Under these circumstances it is our opinion that the petitioner has failed to establish that no rent was obtainable during the taxable years from the property within the meaning of section 505 (b) (1). Another requirement under section 505 (b) (3), supra, namely, that petitioner establish that there was a reasonable expectation that the operation *138 of the property would result in a profit or that the property was necessary to the conduct of the business, has not been met by petitioner. This conclusion is borne out by the following facts: The total investment in the property, to a great extent the result of grandiose improvements, was $343,175.95; the only rental received by the petitioner, which was from Monroe and his wife, was much less than the expenses and fixed charges in connection with the property during the period of their leases and petitioner sustained a net loss on the property during that period of approximately $64,486; that petitioner sustained losses on the property in every year it owned it, (except in 1929 when it received a profit of $36.03), the total of such loss amounting to approximately $116,000; and that the expenses and fixed charges incurred in connection with the property averaged exceeding $18,000 a year for the period 1927 to 1940, inclusive. Thus to have operated the property at a profit during the taxable years it would seem, in the light of many years of past experience, to have been necessary for the petitioner to obtain a rental in excess of $18,000 per annum, and the record shows that after *139 the cancellation of the lease of Mrs. Monroe in June of 1937 and during a period from that time until the sale of the property in October 1941 only $3,600 per annum was offered as such rental. We are further of the opinion that the property involved was not necessary to the conduct of petitioner's business during the taxable years. When the property was acquired it was not acquired because it was necessary to the conduct of petitioner's business, since the facts clearly show that the sole purpose of such acquisition was to provide a residence for its president and his family, and after the death of the president and the refusal of his widow to continue to lease or occupy the premises, they were held for the purpose of selling same, which, under the circumstances, demonstrated that it was not only not necessary to the conduct of petitioner's business, but was a detriment to the successful conduct of such business because of the heavy losses sustained in operating the property which were continuous from 1927 through 1940, with the exception of the small profit of $36.03 in 1929. We do not think it could be said with good reason that notwithstanding the property was not acquired by *140 petitioner as necessary to the conduct of its business its character in that respect was changed, after the purpose of its acquisition had unexepectedly ceased, by the mere holding of it for sale for the evident purpose of getting rid of it as an incubus upon its business. Such a holding for sale during the taxable years does not, in our opinion, fulfill the requirement of the statute; especially since in view of all the facts there could have been no reasonable expectation that the property could be sold at anything other than at a loss. The situation presented here is the one which Congress intended to cover by the conditions imposed by Section 505 (b) (1), (2), and (3), supra, as is shown in the Report No. 1242, p. 14, of the Senate Committee on Finance made on the predecessor counterpart of those subsections in the Revenue Act of 1937, where it is stated with reference to those conditions: To prevent a personal holding company from charging expenses in excess of its income from the operation and maintenance of property, such as yachts, city residences, country estates, etc., against its investment income, such expenses should be disallowed unless the corporation can meet *141 the conditions outlined above. * * * We hold that under Section 505 (b) (1) and (3), supra, the respondent's denial of the claimed deductions was not arbitrary or an abuse of discretion and that he did not err in his determination of the deficiencies herein. Our disposition of the proceedings as set out above renders unnecessary consideration of the effect of Section 505 (b) (2), supra, as applied to the facts herein. Decision will be entered for the respondent.
Footnotes
1. SEC. 505. SUBCHAPTER A NET INCOME. For the purposes of this subchapter the term "Subchapter A Net Income" means the net income with the following adjustments: * * * * *
(b) Deductions Not Allowed. - The aggregate of the deductions allowed under section 23 (a), relating to expenses, and section 23 (1), relating to depreciation, which are allocable to the operation and maintenance of property owned or operated by the corporation, shall be allowed only in an amount equal to the rent or other compensation received for the use of, or the right to use, the property, unless it is established (under regulations prescribed by the Commissioner with the approval of the Secretary) to the satisfaction of the Commissioner: (1) That the rent or other compensation received was the highest obtainable, or, if none was received, that none was obtainable; (2) That the property was held in the course of a business carried on bona fide for profit; and (3) Either that there was reasonable expectation that the operation of the property would result in a profit, or that the property was necessary to the conduct of the business.↩